

# United States Bankruptcy Court
# for the District of Oregon

**Albert E. Radcliffe, Judge**  405 East Eighth Avenue, Suite 2600   (541) 431-4050
Virginia H. Denney, Judicial Assistant   Eugene, Oregon 97401   FAX: (541) 431-4047
Howard J. Newman, Law Clerk

September 3, 2009

Ms Lie Hung Tan  
3264 Ford Drive  
Medford, OR 97504

Mr. David B. Mills  
226 West 8th Avenue, #280  
Eugene, OR 97401

Ms Candace Amborn  
PO Box 580  
Medford, OR 97501

Mr. Loren Scott  
88 East Broadway  
Eugene, OR 97401

Mr. Kim Short  
425 West 3rd Avenue  
Eugene, OR 97401

Mr. G. Jefferson Campbell, Jr.  
PO Box 296  
Medford, OR 97501

Mr. Ronald C. Becker  
405 East 8th Avenue, Suite 1100  
Eugene, OR 97401

Mr. Earl Dorman  
1500 Valley River Drive, #250  
Eugene, OR 97401

Mr. Stephen Behrends  
PO Box 10552  
Eugene, OR 97440

Mr. Wesley McNamara  
620 SW Main Street, #312  
Portland, OR 97205

Internal Revenue Service  
Insolvency Group  
4330 Watt Avenue SA5357  
North Highlands, CA 95660

RE:   TAN, LIE HUNG & MOUNTAIN STATES INVESTMENTS, LLC  
      Case No. 04-61694-aer11  
      Final Account/Final Fees-Under Advisement

Dear Counsel and Parties:

On June 17, 2009, I conducted a hearing and thereafter took matters under advisement.[1] The matters relate to final approval of fees incurred by professionals employed by the Chapter 11 estate and Liquidating Trust. They also relate to approval of Debtor's counsel's fees in the Chapter 7 portion of the case. I will first discuss the general standards for approval of fees and then address the individual applications.

Compensation standards:

The standards for an award of compensation are set out in 11 U.S.C. §§ 330(a)(3) and (4).[2] As I've previously held, under the confirmed plan, even post-confirmation fees are measured by these standards.[3] The customary starting point is to determine the "lodestar," by multiplying a reasonable number of hours expended by a reasonable hourly rate. Boone v. Derham-Burk (In re Eliapo), 468 F.3d 592, 598 (9th Cir. 2006); see also, §§ 330(a)(3)(A) (time spent) & (B) (rates charged) as factors to be considered in awarding fees. The court should examine the circumstances and manner in which services were performed and the results achieved. Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re Mednet MPC Corp), 251 B.R. 103, 108 (9th Cir. BAP 2000). Factors to be considered include the following:

(1) Were the services authorized?;
(2) Were the services necessary or beneficial to the administration of the estate at the time they were rendered?;
(3) Are the services adequately documented?;
(4) Are the fees requested reasonable, taking into consideration the factors set forth in section 330(a)(3)?; and
(5) Did the professional exercise reasonable billing judgment.[4]

Mednet, supra, at 108. Services reasonably likely to provide an identifiable, tangible and material benefit to the estate when rendered are compensable even if they don't actually end up

---

[1] For background I refer to my March 20, 2009, letter opinion. One issue raised therein concerned the prospect of unpaid administrative tax liability and possible disgorgement relating thereto. See, Letter Opinion at f.n. #22. The evidence adduced at the June 17th hearing established that the estate has no such liability.

[2] Unless otherwise indicated, all subsequent statutory references are to Title 11 of the United States Code as it existed on March 9, 2004, the date the petition herein was filed.

[3] See, Letter Opinion entered October 24, 2007, at p. 2, f.n.2.

[4] Reasonable billing judgment is based on the following:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?
(b) To what extent will the estate suffer if the services are not rendered?
(c) To what extent may the estate benefit if the services are rendered and what is the likelihood of disputed issues being resolved successfully?

Mednet, supra, at 108, n. 7 (citing Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc., 924 F.2d 955, 959 (9th Cir. 1991)).

providing such a benefit (as long as the services are otherwise compensable under § 330(a)). Smith v. Hale et. al. (In re Smith), 317 F.3d 918, 926, (9th Cir. 2002), abrogated on other grounds by Lamie v. United States Tr., 540 U.S. 526, 531-39, 124 S. Ct. 1023, 157 L. Ed.2d 1024 (2004) (construing § 330(a)(4)(A)(ii)). See also, Mednet, supra at 108 (construing § 330(a)(3)(C), and holding same). Nonetheless, when a cost-benefit analysis indicates the trustee and his professionals are the only parties likely to benefit, the services are unwarranted and the court may rightly deny fees. Mednet, supra, at 109. Fees for preparation of a fee application are compensable. § 330(a)(6). Further, fees incurred in litigating fee applications are compensable if the applicant "demonstrate[s] that the services for which compensation is sought satisfy the requirements of section 330(a)(4)(A) *and* that its case exemplifies a 'set of circumstances' where the time and expense incurred by the litigation is 'necessary' within the meaning of section 330(a)(1)." Smith, supra at 928 (emphasis in original).

The applicants have the burden of proof to show their fees and expenses are reasonable. Caplin & Drysdale Chartered v. Babcock and Wilcox Co. et. al. (In re Babcock and Wilcox Co.), 526 F.3d 824, 827 (5th Cir. 2008); Roderick v. Levy (In re Roderick Timber Co.), 185 B.R. 601, 606 (9th Cir. BAP 1995). Unlike a proof of claim for pre-petition debt, a fee application, as an administrative claim, enjoys no presumption of validity or accuracy, at least as to those aspects which are challenged. In re Allen Care Centers, Inc., 163 B.R. 180, 181 (Bankr. D. Or. 1994), aff'd, 175 B.R. 397 (D. Or. 1994), aff'd, 96 F.3d 1328 (9th Cir. 1996).

The standards for review of a debtor's attorney's fees under § 329(b) are the same as those under § 330. American Law Center PC v. Stanley (In re Jastrem), 253 F.3d 438, 443 (9th Cir. 2001).

**Earl Dorman:**

Mr. Dorman's two post confirmation applications are reviewable. Debtor objected arguing most accountants quote and charge only $1,000 per year to prepare taxes for a business the size of Debtor's.

Taking the services in both applications together, the fees incurred were for preparing 2005-2008 estate tax returns, determining the bases for the various properties sold and analyzing monthly 2015 reports to determine what estate transactions would impact estate tax returns. Mr. Short testified that Mr. Dorman's hourly rate of $175 was reasonable and I adopt that view. As to time spent, I have carefully reviewed the applications in light of the evidence received and find Mr. Dorman's time was also reasonable. Accordingly, Mr. Dorman's supplemental fees will be allowed as applied for and no disgorgement ordered.

**Behrends, Swingdoff, Haines & Critchlow (BSHC):**

Shortly before the June 17th hearing, BSHC withdrew from consideration all but previously paid fees. Counting the $7,500 retainer,[5] the paid compensation totals $48,048.25 in fees and $770.19 in expenses.

Debtor's and her sister Lie Foen Tan's (LFT)[6] objections largely revolve around the firm's alleged omissions. The firm was retained on August 19, 2004, while the case was in Chapter 7.[7] The § 727 default judgment had been entered a day earlier. Debtor contends the firm picked the wrong strategy in recommending conversion to Chapter 11 and attempting an orderly liquidation to pay all creditors in full. She argues the firm should have advocated either for dismissal or a set aside of the default judgment.

I agree with the firm in this regard. Its advice was sound. As to dismissal, this was a case with significant non-exempt assets. Further, Debtor's theory that dismissal was warranted for her failure to pay fees or attend the § 341 meeting is misguided. It is clear any motion to dismiss would probably have been denied.

Further, any motion to vacate the § 727 default judgment would also likely have been denied. To vacate a default, one must present specific facts that would constitute a defense on the merits. TCI Group Life Ins. Plan v. Knoebber, 244 F.3d 691, 700 (9th Cir. 2001). It does not appear that Debtor has any such defense. The § 727 complaint was based, in large part, on concealment of assets and transfers. In prior proceedings in this case, Debtor has admitted her original schedules were grossly inaccurate. This is confirmed by the follow-up schedules she filed in the Chapter 11 portion of the case which list many previously undisclosed properties as well as her interest in Mountain States Investments, LLC (Mountain States). It would probably have been fruitless to move to set aside the default. Even assuming the default was set aside, it would probably have been fruitless to defend the § 727 action on the merits.

Debtor contends BSHC should have objected to Ms Amborn's fees as Chapter 7 trustee.[8] She argues that because Ms Amborn distributed no monies to creditors, she was only entitled to the $60 "no asset" fee provided by § 330(b). In this District, this argument has been addressed and rejected. In re Berry, 166 B.R. 932 (Bankr. D. Or. 1994); In re Colburn, 231 B.R. 778 (Bankr. D. Or. 1999).

---

[5] BSHC's final application indicates it received $5,000.00 on August 17, 2004, and $2,500.00 on September 15, 2004, both from Debtor's post-petition personal services income. The fee agreement attached to the firm's § 329(a) disclosure of compensation filed October 12, 2004, indicates these sums were "earned on receipt retainers." BSHC's retention order entered December 20, 2004 (*nunc pro tunc* September 17, 2004), specifically provides that "all compensation, including non-refundable retainers" is subject to final court approval. (emphasis added).

[6] Subsequent references to Debtor's objections include those of LFT.

[7] Once the case converted to Chapter 11 on September 17, 2004, the firm, after notice, was employed as DIP's counsel retroactive to the date of conversion.

[8] After application, notice and no objection, Ms Amborn was awarded $5,200.00 in fees and $51.61 in expenses by order entered September 25, 2006.

Debtor argues fees should be reduced based on several aspects of her agreement with BSHC. She first argues the $7,500 earned on receipt retainer (see, f.n. #5 supra)[9] was illegal, however, such retainers are not unenforceable per se. See, In re Heritage Mall Associates, 184 B.R.128 (Bankr. D. Or. 1995). Under the Heritage Mall, criteria, the $7,500, when compared with the ultimate fees incurred, was not unreasonable. The agreement is enforceable.[10]

Debtor next argues that while the case was in Chapter 7, the firm improperly took a trust deed in the Humbug Creek property to secure its fees. Debtor is listed as grantor under the trust deed personally, not in any representative capacity. Ex. 7.[11] Mr. Behrends testified the firm only intended to enforce the trust deed if the property was abandoned to the Debtor, however, the amended schedules filed October 12, 2004 note that at the time the trust deed was executed, title to the Humbug Creek property was in Mountain States. It is questionable what authority Debtor had to grant the trust deed in her individual capacity. Even if Debtor was the intended grantor, the parcel would have been property of the Chapter 7 estate. Accordingly, Debtor had no authority to convey any interest in this property. I will disallow (and order disgorgement to the Debtor of) $218.76 in fees and costs related to the execution and recordation of the trust deed, including the time and expenses of Attorney Michael Guy.[12] The trust deed later appeared on a title report when Mr. Short was preparing to sell the property, causing Mr. Scott to write Mr. Critchlow requesting its release or reconveyance as an avoidable § 549 transfer, Ex. 13 and later to draft a tolling agreement.[13] The Muhlheim Boyd firm's interim application filed July 21, 2006, indicates it incurred $165 in fees on the initial e-mail to Mr. Critchlow. Its first supplemental (post-confirmation) fee application indicates it incurred $132 in additional fees dealing with the tolling agreement. BSHC will be ordered to reimburse $297 to Mr. Short as Liquidating Trustee. There are also disclosure issues regarding the trust deed.[14] The firm's §

---

[9] The un-controverted evidence established the retainer funds came from Debtor's post-petition personal services earnings and were not estate property. § 541(a)(6).

[10] However as Heritage Mall at 134 notes, § 329 nonetheless allows me to review the reasonableness of the $7,500. In fact, the retention order itself preserves this review. See, f.n. #5 supra.

[11] Unless otherwise indicated, all references herein to "exhibits" are to those admitted at the June 17th hearing.

[12] Schedule C to the firm's November 1, 2005, fee application notes itemized billing entries relating to Mr. Guy and a "trust deed." See, September 7, 2004 and September 15, 2004 (cost) entries. Because of the proximity to the Humbug Creek trust deed's execution on September 10, 2004, and recordation three days later, I assume these entries relate thereto. If they do not, they are insufficiently described so as to warrant disallowance in any event.

[13] BSHC agreed to the trust deed's release/reconveyance. The Humbug Creek property however was never sold and has since been abandoned to the Debtor. At the June 17th hearing, the firm agreed to release it once again, this time to the Debtor.

[14]     "Debtors' attorneys are . . . subject to the requirements of § 329, which requires that any attorney representing a debtor file 'a statement of the compensation paid or agreed to be paid' for bankruptcy services, if any payment or agreement was made within a year before bankruptcy,

(continued...)

September 3, 2009
Page-6

329 statement filed October 12, 2004, attaches the fee agreement with Debtor, which in turn references a security agreement given either by Mountain States or Debtor. It does not specify the security. The trust deed itself was not attached. The existence of the trust deed was disclosed in the amended schedules as an exhibit to Schedule B, listing the assets of Mountain States, however, as held in Addison, supra at 2008 WL 1902429, *4, parties in interest should not have to look at multiple documents to piece together the components of Debtor's counsel's fee arrangement. Later, (on October 26, 2004) Debtor (then, "in possession") applied to employ BSHC. The fee agreement and security agreement were referenced as attached to the application when, in fact, they were not. Mr. Behrends testified at the June 17th hearing that this omission was inadvertent. At no time has BSHC submitted the actual trust deed.

---

[14](...continued)
and 'the source of such compensation.' § 329(a). Counsel must file this statement whether or not the attorney applies to the court for compensation. Rule 2016 implements this requirement, and provides that counsel for a debtor must file, within 15 days of the order for relief, the statement required by § 329. Fed. R. Bankr.P. 2016(b)."

"In disclosing the fee arrangement, 'the applicant must disclose 'the precise nature of the fee arrangement,' and not simply identify the ultimate owner of the funds.' *In re Park-Helena Corp.,* 63 F.3d 877, 881 (9th Cir.1995). An applicant must lay bare all its dealings . . . regarding compensation . . . . [The] fee revelations must be direct and comprehensive. Coy, or incomplete disclosures . . . are not sufficient. *Id.* (quoting *In re Saturley,* 131 B.R. 509, 516-517 (Bankr. D. Me.1991))."

The disclosure requirements allow oversight of fee arrangements between debtors and their counsel. 'Section 329(a) seeks to prevent overreaching by debtor's attorneys and serves to counteract the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure.' In Re Perrine, 369 B.R. 571, 579-580 (Bankr. C.D. Cal. 2007) (internal quotations omitted).

In re Addison, 2008 WL 1902429, *4 (Bankr. D. Or. 2008) (quoting In re Farrington, 2007 WL 4365753, *4 (Bankr. D. Or. 2007).

Because BSHC was also employed as DIP's counsel, FRBP 2014's requirement that an application to employ state "any proposed arrangement for compensation" and that the applicant verify any "connections" to any party in interest, also apply.

"The disclosure rules are literally applied, and '[n]egligent or inadvertent omissions 'do not vitiate the failure to disclose.'' *Park Helena Corp.,* 63 F.3d at 881 (quoting *In re Maui 14K, Ltd .,* 133 B.R. 657, 660 (Bankr. D. Haw. 1991)). Failure to comply with the disclosure rules is sanctionable, 'even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule.' *Id.* at 880."

Addison, supra (quoting Farrington, supra at 2008 WL 4365753, *5.)

      Another aspect of the firm's fee arrangement also suffers from disclosure issues. After Mr. Short was appointed Chapter 11 trustee in June, 2005, BSHC continued to represent Debtor. On January 13, 2006, Debtor executed a "Renewal of Fee Agreement"(the Renewal). Ex.12. The Renewal provided for the firm's continued employment under the original fee agreement's terms. In addition, it provided the firm was entitled to compensation for its work post-trustee appointment. Debtor agreed that any plan would contain provisions to ensure the firm's compensation. Under the Renewal, BSHC would have the right to assert a claim for attorney fees and such claim [including post-trustee appointment fees] would be paid or otherwise satisfied in full from estate assets before any assets reverted to Debtor. Debtor thus agreed to subordinate any surplus to post-trustee appointment fees. The Renewal, however, was never disclosed, in violation of FRBP 2016(b). In re Clark, 2009 WL 936666, *5 (Bankr. D. Or. 2009) (citing In re Perrine, 369 B.R. 571, 579 (Bankr. C. D. Cal. 2007) (counsel has continuing duty to disclose under FRBP 2016(b)). This prevented the oversight contemplated by § 329(b). Clark, supra.

      In light of the disclosure violations, I will order BSHC to disgorge $3,000 of the $7,500 earned on receipt retainer to the Debtor.[15]

      Aside from disclosure issues, I have examined the November 1, 2005, application's narrative and billing entries.[16] For the most part, I find the time expended and hourly rates were reasonably likely to provide an identifiable, tangible and material benefit to the estate when rendered. Smith, supra at 926. BSHC gathered information and prepared the amended schedules and statement of financial affairs.. This was no small task given the extent of Debtor's holdings, both directly and through her interest in Mountain States. It spent a great deal of time dealing with property sales and creditors secured therein. It also dealt with Mountain States matters. The firm fended off several United States Trustee (UST) motions to convert, based on Debtor's failure to perform as a fiduciary and her non-disclosures of pre-petition transfers. It filed an adversary against the Jacobs to avoid the preferential grant of trust deeds on two properties. It entered into a stipulated judgment with Mountain States, avoiding Debtor's transfers thereto in nine properties. It drafted and filed a plan and disclosure statement, which like Mr. Short's, provided for liquidation of Debtor's real property. Despite these efforts, the UST eventually moved to appoint a Chapter 11 trustee. The basis of the motion, however, was the Debtor's non-disclosure (on direct inquiry) of an offer she'd made, post-petition, to purchase property in Phoenix, Oregon. The UST also had concerns about her foster care business. These problems were not of BSHC's making.

      Two matters, however, deserve further scrutiny. As Debtor testified, the reason she filed her Chapter 7 pro se petition was to stop a foreclosure sale on 1134 Court St., Medford. This was the "car wash" property. Pre-petition, Debtor gave a trust deed thereon to "The Foundation for Human Understanding" (the Foundation). She was in default on the underlying note and a

---

[15] This reduction takes into consideration, as a mitigating factor, BSHC's waiver of $9,313 in fees incurred pre-trustee appointment and $15,164 in fees and expenses incurred post- trustee appointment. A substantial portion of these fees, if allowed under a § 329 review, could have been collected from Debtor personally.

[16] The plan and disclosure statement were eventually withdrawn in the face of Mr. Short's appointment.

non-judicial sale was scheduled for March 10, 2004. She filed her skeletal petition on March 9, 2004. On the mailing matrix, she listed the "Foundation and Human Understanding" (sic) at its attorney, Patrick Kelly's address. On March 13, 2004, the Foundation was served with notice of the bankruptcy. It is not apparent, from the record, whether the Foundation received notice before then in time to stop the March 10th sale. On her pro se schedules filed on March 25, 2004, Debtor did not list the Court St. property on Schedule A. She did, however, list the Foundation on Schedule D, as a creditor owed $750,000 secured by Court St., valued at $900,000.[17] The property was eventually sold by non-judicial sale and a trustee's[18] deed dated August 19, 2004, was transferred to the Foundation for a recited consideration of $404,988. Ex. 4. The Foundation sold the property nine months later for $775,000. Ex. 9.

Debtor argues BSHC neglected its duty to avoid the sales and administer the property. She argues the property's equity is proven by the $775,000 received on resale. Mr. Behrends testified the Foundation had received relief from stay before the firm's retention. He further testified he discussed the matter with Debtor who never told him there was equity in the property. Finally, he testified Debtor agreed the firm would not work to reinstate the stay, as the property had a junior lien against it and it would be burdensome to administer.

Although this testimony may be accurate as to discussions about equity, the court's file reflects no relief from stay granted to the Foundation. As such, it appears the sales were void as in violation of the stay. Should the firm have pursued the matter? Was the estate damaged? Debtor argues the re-sale price proves over $330,000 in equity was lost however, the consideration paid by the Foundation was likely a credit bid. Debtor's own pro se schedules indicated $750,000 was owed against the property as of March, 2004, giving credence to Mr. Behrends' testimony that there was a junior lien (which Debtor had not listed on her pro se schedules). By the May, 2005, re-sale, the debt with interest would likely have risen to more than the $775,000 purchase price. As such, I find that despite the stay violation, it would not have benefitted the estate to administer the Court St. property and no fee reduction is warranted for failure to set aside the sales.

The other matter pertains to Debtor's homestead. Her pro se Chapter 7 schedules listed the Cherry Lane property on Schedule A and an exemption was claimed therein on Schedule C as her homestead. Debtor's amended schedules, filed post-conversion on October 12, 2004, listed the Cherry Lane property as an asset of Mountain States. Further, no homestead was claimed in any property. Debtor argues the failure to claim a homestead was neglect by the firm. Mr. Critchlow explained the omission at the June 17th hearing. He testified that Debtor had stated, either at the § 341(a) meeting of creditors or in a FRBP 2004 exam, that she only had an office at Cherry Lane, which was where her adult foster home was located and that she resided at either the W. Gregory St. or Ford Dr. property.[19] I find this testimony credible. As it turned out, years later Debtor did claim the Cherry Lane property (rightly or wrongly) as her homestead, although she attempted to claim a $125,000 exemption. The Liquidating Trustee objected to any

---

[17] Neither the Court St. property nor the Foundation were listed on Debtor's amended schedules filed after conversion.

[18] That is, the trustee under the trust deed.

[19] Likewise the Ford Dr. and W. Gregory St. properties were listed as assets of Mountain States.

amount over $25,000, the maximum permitted under ORS 18.395(1) at the time the case was filed. By order entered November 16, 2007, the exemption was eventually allowed for $25,000. As such, even if BSHC somehow neglected its duty, Debtor suffered no damage. Considering all relevant factors as required by § 330(a)(3), I will not reduce fees for the firm's failure to claim a homestead exemption.

**Muhlheim Boyd (MB):**

The only fees reviewable for MB are those represented in the firm's three post-confirmation "supplemental" applications. Taking the last (third) supplemental application first, neither Debtor nor the Jacobs object to the $4,099.09 of expenses applied for and they will be allowed. As to fees, Debtor has filed specific objections. Many concern services Debtor argues Mr. Short should have performed himself, citing my October 24, 2007, letter opinion. See, f. n. #3, supra. The standards enunciated therein remain good law. The majority of Debtor's objections will be overruled because, taking the standards to heart, MB did not charge for most of the items which arguably could be construed as "trustee time." There are several charged entries, however which will be disallowed. The largest are for compiling and drafting the final report and for "securing" Cherry Lane after Debtor's adult son, Joseph Horsley's eviction.[20] The total disallowed charges are $1,261.00. I did allow certain de minimis entries for "trustee" time if it resulted from counsel receiving a call or e-mail from a creditor or the UST, as it was more efficient for counsel to deal with the matter then than refer the caller or e-mailer to Mr. Short. Most of these entries were 0.1 hour.

Other reductions relate to the Donna Wojcznski claim. As the parties will recall, Mr. Short initially objected to the claim, but then conceded its validity because Debtor would not help him prosecute the objection (as she was, at the time, invoking her 5th Amendment rights against self-incrimination). Years later, and after Ms Wojcznski had received an interim distribution on her claim, Debtor moved to set aside the Wojcznski "settlement."[21] I construed this as an objection to claim. Mr. Short, through counsel, opposed Debtor's objection, arguing it was beyond the time-line set in the plan to object. The plan, however, allowed the court to vary the deadline. After hearing, I allowed Debtor's objection to be filed as timely. I've therefore disallowed MB's time in opposing its timeliness. This totals $188. Debtor's objection went to a hearing on the merits on January 15, 2008. Mr. Scott attended the hearing, but did not charge for it. Debtor prevailed. I asked Mr. Scott to prepare a disgorgement judgment against Ms Wojcznski for $9,660.75. The judgment was entered on February 6, 2008. I've allowed the firm fees for preparing the judgment, registering it in Jackson County and attempting to collect it.[22]

Debtor objected to MB charging paralegal time for compiling and processing data for the electronic filing of various motions and other documents. She argues this is a clerical task. On this issue, MB did not sustain its burden of proof as to allowability. The total disallowed for

---

[20] I did allow MB compensation for actually prosecuting the FED action.

[21] Debtor inaccurately characterized the resolution of Mr. Short's prior claims objection as "settled."

[22] Collection attempts were ultimately unsuccessful and the Wojcznski judgment has been abandoned to the Debtor.

these entries is $1,742. I will, however, allow over Debtor's objection, paralegal time for preparation of certificates of service. Debtor also objected to miscellaneous other entries on the basis the paralegals were performing clerical functions. I have carefully reviewed them and conclude the paralegal work was correctly billed.

Debtor objects to the hourly rates of MB's paralegals, Sheri Cooke ($75) and Dawnne Linenbrink ($130-150). In her written objection, she argues $40/hour is reasonable.[23] Conde Cox, MB's expert, testified that MB's charges were reasonable. This includes the paralegals' charges, which includes their hourly rates. The only controverting evidence was Debtor's Ex.14 which is an internet listing of the average paralegal's salary in Eugene. Debtor appears to argue that MB can only charge the estate what their paralegals earn in (hourly equivalent) salary. As a matter of law that is wrong. In re Johnson, Case # 04-36802-elp13 (Bankr. D. Or. April 19, 2006) (letter op.) (Perris, J.).

I have also reviewed MB's first and second supplemental applications. Debtor objected to the second application when it was originally noticed, based mainly on improper delegation of trustee duties to counsel. After an extensive hearing in September, 2007, I reduced fees by $1,371.[24] Nothing adduced at the June 17th hearing has caused me to reconsider the prior award.

As for the first supplemental application, Debtor did not object when it was originally noticed, however, her present objection, based on improper delegation, gives fair notice of that ground for all applications under review. Again, using the criteria enunciated in my October 24, 2007, letter opinion, I have disallowed $1,799.50 for improper delegation plus an additional $16.50 for clerical duties charged at paralegal rates and $33.00 in duplicative time, for a total of $1,849.00 in reductions. Most of the disallowed entries relate to counsel handling motions/notices to sell and sale closings.

As to the more generic objections which may pertain to all three supplemental applications, the Jacobs and Debtor have objected based on:

> 1) "excessive attorney fees and administrative costs in pursuing particular legal matters";
> 2) "unwise or imprudent decisions by the Chapter 11 Trustee as to liquidation of certain properties and dealings with the Debtor and her sister";
> 3) "certain adverse rulings against the Chapter 11 Trustee's legal positions taken as to claims by the Debtor, the Debtor's sister, and other third parties as to particular parcels of real property in the estate"; and

---

[23] In determining a reasonable hourly rate, I am to consider multiple factors including, "the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, the results obtained and the superior performance of counsel." In re Johnson, Case # 04-36802-elp13 (Bankr. D. Or. April 19, 2006) (letter op.) (Perris, J.) (quoting, Faubion v. City of Prineville, 2001 WL 34041782, *1 (D. Or. Nov. 7, 2001)). "In determining a reasonable hourly rate, the court must look to the prevailing market rates in the relevant community. The fee applicant has the burden of showing that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." Id. (citing, Faubion, supra at *4).

[24] Although denial was only on an interim basis, MB has not reapplied for the denied fees.

        4) "declines in the local real estate market."

The objectors do not recommend a particular amount for disallowance. They request disgorgement of "such amounts as the Court finds to be reasonably necessary, just and equitable, to allow an additional payment to . . . unsecured creditors."

Examining the objections, the declining real estate market cannot be held against Mr. Short or MB. "[E]xcessive fees . . . in pursuing particular legal matters" is too generic to apply any of § 330's criteria.

"[U]nwise decisions" as to liquidation and dealing with Debtor and LFT, refers, in part, to Mr. Short's (and MB's) handling of the Cherry Lane and Ford Dr. properties. Initially LFT and Mr. Robertson (presumably on Debtor's behalf) made offers to purchase these properties. After much delay, the offers fell through. Mr. Short then had to market to third parties. To get the properties ready for sale, he had to file an adversary proceeding to evict LFT from Ford Dr. He also had to file a turnover motion against Debtor to get possession of Cherry Lane and then had to file an FED to evict Mr. Horsley. Mr. Horsley appealed and tried to mandamus the trial judge by filing a petition with the Oregon Supreme Court, which the estate had to defend. All in all, Debtor, her son and LFT put up many barriers to possession. As to timing, there was good reason to wait to sell these properties. They were Debtor and LFT's homes and equally as important, their foster care clients resided there. After a certain point it became obvious this would not be a surplus estate and the properties would need to be marketed. Ms Jaster testified as to the marketing and resultant insufficient offers. I cannot find fault with the marketing. The offers were scarce because the real estate market was bottoming out in 07-08 through no fault of Mr. Short or MB. Auction was the last possibility to gain equity. While it is true, Mr. Short and MB failed to get the auction timely noticed, the firm did not charge for any of the auction-related services. Was any equity actually lost by the failure to timely auction the properties? Again, the offers while the properties were being traditionally marketed where few and insufficient to net equity. In light of all the evidence, I am unprepared to disallow any further fees than those MB has already waived on this matter.

Objection # 2 also relates to MB's and Mr. Short's fees for services related to sales of seven properties:

        1) 21350 Yellowjacket Rd., Beatty;
        2) 535 Crestdale, Klamath Falls,
        3) 208 Iowa St., Medford;
        4) 66000 Hwy 140, Bly;
        5) 8056 Harlan Dr., White City;
        6) 7566 Torrey Pines Terrace, Eagle Point; and
        7) 103 West St., Talent.

All of these sales, however, took place pre-confirmation. As such, under the May 20, 2009, letter opinion, MB's fees relating thereto are final and non-reviewable.[25]

---

[25] LFT also objected generically that the trustee "took" her property and then failed to pay her claim. She argues I should order disgorgement from Mr. Short and MB sufficient to pay her unpaid

(continued...)

Finally, the objection based on adverse rulings against Mr. Short, on claims by the Debtor, LFT and other third parties is also generic. From a review of the entire record, each side prevailed on several matters. I find the estate's defense of these matters reasonable, even when it lost.[26]

**R.  Kim Short**:

The $26,662.39 in fees awarded under Mr. Short's two post-confirmation requests are reviewable. Debtor and the Jacobs have objected. As discussed above, the applicant bears the burden of proof on a claim for compensation. Mr. Short argues his applications should get the benefit of presumed validity under In re Owens, 2008 WL 4224530 (Bankr. D. Or. 2008). Owens held § 330(a)(7), enacted under BAPCPA, providing that a trustee's fees should be treated as a commission, applied retroactively to pre-BAPCPA cases. Nevertheless, Owens does not apply here. The confirmed plan's binding effect under § 1141 takes precedence. The plan at § 4.3 sets Mr. Short's rate of compensation at $150/hour for services, as both Chapter 11 and Liquidating Trustee, with the percentages upon distributions in § 326 as an aggregate cap. As such, Mr. Short's compensation should be measured under traditional § 330(a) principles, with the lodestar as the mainstay and § 326 as a cap. I have reviewed the subject applications under these criteria.

Debtor argues Mr. Short's fees should be reduced because he did not ensure the estate's taxes had been paid, however the evidence adduced at the June 17th hearing indicates all estate taxes have, in fact, been paid. She also argues he neglected his duty to object to Ms Amborn's fees because she was only entitled to a $60 fee for a no-asset case. I've discussed that objection above with regard to BSHC's fees; it has no merit.

Debtor also objects to Mr. Short's failure to protect the alleged equity in the Court St. property. Again, I have discussed that objection with regard to BSHC. Mr. Short testified the Court St. foreclosure preceded his appointment and he was unaware the property was sold at a profit. In fact, he may not have been aware of Debtor's interest in Court St. at all. Although her Chapter 7 schedules listed it, Debtor's Chapter 11 amended schedules did not. Even if Mr. Short was, or should have been, aware of the property's foreclosure in violation of the stay, my comments as to BSHC also apply to Mr. Short and no reduction will be ordered.

---

[25](...continued)
claims in full. In fact, Mr. Short and his counsel didn't "take" anything. LFT's nine properties came into the estate by virtue of a settlement in Adv. # 05-6185-aer. In return, LFT obtained an allowed secured claim for $60,000 which was paid with the proceeds of the Arrowhead Rd. property and an allowed general unsecured claim of $60,000, 22% of which has been paid, along with the rest of the general unsecured creditors. LFT repeats the argument that she was fraudulently induced to settle by Mr. Short's promise that she'd be paid in full and that her former properties wouldn't be sold. I've heard a great deal of testimony in other hearings on this matter. I am unprepared to make a finding that Mr. Short or MB committed fraud and will not reduce fees based on LFT's argument.

[26] For instance, LFT filed an administrative expense claim for funds she advanced to pay down mortgages on the Ford St. and W. Gregory St. properties. On Ford St., the estate successfully defended and LFT's claim was denied. On W. Gregory St., there was a split decision of sorts. In round numbers, LFT asked for a $31,000 administrative claim. She ended up with an allowed $15,900 claim.

      Debtors and the Jacobs object on the four grounds discussed above with respect to MB. In that discussion, I have also discussed Mr. Short's role and will not repeat it here. Most of Mr. Short's services associated with these objections were incurred <u>post</u>-confirmation. He is not seeking any compensation for these services, as his <u>pre</u>-confirmation fees exceeded the cap.

      Debtor objects to Mr. Short selling the seven properties listed in the MB discussion at no benefit to the estate. She alleges his "commission" plus counsel's fees ate up any equity therein. As discussed above, however, this is not a "commission" case. In reviewing the sales, I must bear in mind that they were noticed and approved by order. While this does not necessarily equate to allowance of all fees related thereto, it does establish that the sales had merit at the time proposed.[27] I have reviewed Mr. Short's applications, bearing in mind that because of the § 326 cap, he incurred over $18,500 in <u>pre</u>-confirmation fees for which he cannot be paid.[28] Any disallowed time on these sales does not approach that figure.[29]

---

[27] I have reviewed the sales motions and orders. Two of the properties were not even sold by Mr. Short.

      The 103 West St. property was sold by Mary Hinson under a stipulated order (<u>which Debtor's counsel signed</u>) in Adv. #05-7028-aer. The adversary brought by Mr. Short was then stayed pending a determination of whether there would be a 100% return to creditors. In late 2008, Mr. Short noticed an intent to abandon the claims against Hinson. This was approved and all claims against Ms. Hinson have been abandoned to Debtor.

      The Torrey Pines Terrace property was actually sold by Debtor, then "in possession" before Mr. Short's appointment. Debtor can hardly object to Mr. Short's fees, as there were none related thereto.

      At least one sale by Mr. Short, 8056 Harlan Dr., did not net any proceeds to the estate. However this was plain from the motion, as was the explanation that the sale was being pursued to reduce creditor Mayes' blanket lien so as to free up equity in other property subject to the lien. On another, Yellowjacket Rd., Debtor claims the estate netted nothing. In fact however, the estate netted over $77,000 by avoiding the Mayes' asserted lien therein.

[28] Mr. Short has accrued $164,015 in total time ($118,812 of which was pre-confirmation), yet his total fees have been capped at $100,308. Ex. MM.

[29] In addition, by order entered September 25, 2007, I allowed, after a lengthy evidentiary hearing, all fees encompassed in Mr. Short's second post-confirmation request ($11,593.65). Although now reviewable, nothing adduced at the June17th hearing has caused me to reconsider my prior ruling.

**Conclusion**:

Except as discussed above, I reject all of Debtor's other arguments regarding her objections to the final report and to professionals' fees.

Of the fees up for review, I will approve all of Mr. Dorman's, of which $3,937.50 remains unpaid. Since MB has agreed to subordinate its fees to Mr. Dorman's, I will authorize full payment. I will approve $44,532.49 of BSHC's fees and $770.19 in expenses, for total allowed compensation of $45,302.68. BSHC has been paid a total of $48,818.44. It will be ordered to disgorge $3,218.76 to the Debtor within 60 days, and $297.00 to Mr. Short within 30 days. I will approve all of Mr. Short's fees under review. No disgorgement will be ordered. Finally, I will approve $52,642.50 of MB's fees and $5,637.29 in expenses, for total compensation of $58,279.79. Of that, $22,782.45 has been paid leaving $35,497.34 unpaid. MB is to be paid after Mr. Dorman. I realize this will only result in partial payment. If funds come into the Liquidating Trust as a result of Debtor's pending objection to the IRS' proof of claim, Mr. Short is authorized to pay MB up to the allowed amount of its fees, without further court order. If added funds exceed MB's allowed compensation, Mr. Short is directed to file an amended final account with the proposed distribution of the excess.

The above constitute my findings of fact and conclusions of law under FRBP 7052. They shall not be separately stated.

> Very Truly yours,
>
> *albert E. Radcliffe*
>
> Albert E. Radcliffe
> Bankruptcy Judge